1
2
3
4
5
6
7
8
9

**UNITED STATES DISTRICT COURT**

10

**SOUTHERN DISTRICT OF CALIFORNIA**

11

12   BENJAMIN LEE BATHEN,

13                                     Petitioner,

14   v.

15   KATHLEEN ALLISON, et al.,

16                                     Respondents.

Case No. 20-cv-2063-MMA (MSB)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS;**

**AND DENYING CERTIFICATE OF APPEALABILITY**

17
18
19          Petitioner Benjamin Lee Bathen ("Petitioner") is a state prisoner represented by

20   counsel and proceeding with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C.

21   § 2254.  *See* ECF No. 1 ("Petition").  The Court has read and considered the Petition, the

22   Supplemental Briefing filed by Petitioner, *see* Doc. No. 11, the Answer and

23   Memorandum of Points and Authorities in Support of the Answer, *see* Doc. Nos. 16, 16-

24   1, the Traverse *see* Doc. No. 19, the lodgments and other documents filed in this case,

25   and the legal arguments presented by both parties.  For the reasons discussed below, the

26   Court **DENIES** the Petition and **DENIES** a Certificate of Appealability.

27
28

1

# I. FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The state appellate court recited the facts as follows:

> C.J. is a psychologist in private practice in Chula Vista.  She began treating Bathen in person from her office in 2004.  Bathen eventually moved to Los Angeles and continued his treatment with C.J. telephonically.  C.J. is only licensed to practice in the state of California.  As a result, she was required to terminate her sessions with Bathen shortly after he moved to the east coast in 2008.  After conducting a few more telephonic sessions with Bathen to ensure his "continuity of care," C.J. provided him referrals for psychologists in his area.  Bathen "was not happy" and became "agitated" when he learned C.J. was ending his therapy sessions.
>
> A few months later, C.J. began receiving emails from Bathen stating he was upset with her and asking her to apologize to him.  He also threatened to lodge a complaint with her professional organization if she refused to listen to his grievances or failed to provide him with a face-to-face apology.  The emails made C.J. feel "uneasy."  Accordingly, she requested Bathen's new address so she could send him a formal termination letter, but he declined and would only have contact via email.  Except for this email correspondence in early 2009, C.J. and Bathen did not speak telephonically or in person after his last session took place in 2008.
>
> Almost nine years later, C.J. was home alone when she received the following message on her confidential office voicemail system:
>
> > "Hey Dr. [C.J.], I just want to let you know that I'm going to bust your fucking skull open you worthless bitch.  You don't ever fucking talk to me like that you fucking whore.  Fuck you.  I'll bash your fucking skull.  You're fucking dead.  I'm going to carve you up you fucking whore.  Shut the fuck up!"
>
> C.J. became "terrified," "afraid," "nauseous," and "numb" when she

2

heard the message.  Not knowing if the person was nearby, she looked around the house and confirmed all the doors and windows were locked.  She immediately called her husband and left a voicemail asking him to come home as soon as possible.  C.J. sounded "concerned and nervous" when her husband returned the call and appeared "upset" when he arrived home.  After C.J. played the message for him, he accessed her voicemail system through the telephone company's website and ascertained the telephone number that made the call.  He then performed an Internet search to determine the name associated with the telephone number, revealing Bathen's name.  He shared this information with C.J., who reported it to the Chula Vista Police Department.

Although C.J. did not initially recognize Bathen's voice on the message, she later recognized it when her husband mentioned Bathen's name. She recognized Bathen's inflection and high-pitched voice due to prior therapy sessions where he had become agitated.  C.J. testified Bathen's voice sounded the same as when he was "anxious," "angry," or "stirred up" in his therapy sessions.  C.J. did not know Bathen's location when she heard the voicemail.

After reporting the incident to law enforcement, C.J. remained afraid and on "pretty high alert."  She reexamined her home security system and had security doors installed at her office.  At work, she walked to and from her car in the office parking lot with coworkers and had her husband meet her at the office and drive home with her when she worked late.  She also installed a doorbell system at her office to restrict entrance into the building.  At home, she became more vigilant and focused on her safety and security.  She kept her doors and windows locked and avoided shopping centers with garages.

About a month later, C.J. received the following voicemail:

"Hey Dr. [C.J.], I just wanted to let you know what a fucking bitch you are.  You don't talk to me about fucking dating you asshole.  You should start dating.  You should start dating.  I can hurt you too you mother fucker.  I'm going to carve you up, I'm going to rape you, I'm going to torture you, I'm going to fuck you up.  I'll carve your fucking smile off your face you stupid bitch.  I'm not going to start fucking dating!  Fuck you!"

This time, C.J. immediately recognized Bathen's voice.  She had a visceral reaction to the message and vomited.  She noticed more intensity in Bathen's voice and the message "terrified," "frightened," and "humiliated"

her given its sexual content. She "thought [her] life was in danger" because Bathen's threats had escalated, becoming more violent and explicit. At that time, she still did not know Bathen's location. She again reported the incident to her husband and the police.

Two days later, C.J. received the following voicemail:

"Hey Dr. [C.J.], I just want to let you know that I'm still planning on coming out there kidnapping you, torturing you, raping the living shit out of you, and then I've come up with a great idea, I'm going to set you on fire. You dumb fucking bitch. Fuck you! Maybe you think, maybe get laid. Your friends thing you need to get laid. You thought that shit was funny. You're going to fucking die. Then I'm going to find your daughter. I'm going to rape and murder that bitch too. You're fucking dead."

C.J. recognized Bathen's voice. This concerned C.J. as she did not recall ever mentioning her daughter to Bathen. C.J. thought she and her daughter were in danger. She called the police again to report the incident.

After receiving the third voicemail, C.J. applied for and received a civil restraining order against Bathen. She relied on law enforcement to locate Bathen and serve him with a notice to appear at the restraining order hearing. C.J. felt "really uncomfortable" during the hearing but "wanted to do what [she] could to try to put everything [she] could in [her] life around [her] to stay safe." According to her husband, C.J. became "very, very afraid" and placed their home on "lockdown." At trial, C.J. testified she still felt "upset" and "shaky" after hearing the first voicemail again in court. She kept her doors locked at home and continued to be afraid of Bathen. She also suffered from higher levels of anxiety and sleep issues due to her heightened vigilance toward protecting herself, added privacy and security measures to her social media accounts, and deleted her professional social media account to decrease her and her family's online presence.

At trial, a district attorney investigator testified about the "call detail records" for the telephone number associated with the threatening messages and confirmed the telephone calls were placed near Bathen's home and work addresses. Another district attorney investigator testified as an expert witness about the technical details of cell phones connecting to cell towers and the cell tower tracker mapping program.

Bathen's defense at trial was the prosecutor could not prove he was the

person who made the threatening phone calls.  Maintaining his innocence, Bathen presented expert witness testimony at trial challenging the accuracy of cell tower tracking.

The jury returned guilty verdicts on all three criminal threat counts.  The court denied probation and sentenced Bathen to a total prison term of two years.

Doc. No. 17-13 at 2–6.

## II. PROCEDURAL BACKGROUND

On June 11, 2018, the San Diego District Attorney's Office filed an Amended Information charging Petitioner with three counts of making a criminal threat, a violation of California Penal Code § 422.  *See* Doc. No. 17-1 at 15–17.  Following a jury trial, Petitioner was convicted of all three counts.  *See id.* at 264–66.

Petitioner appealed his conviction to the California Court of Appeal.  *See* Doc. Nos. 17-10–17-12.  The state appellate court upheld his conviction in a written opinion.  *See* Doc. No. 17-13.  Petitioner filed a petition for review in the California Supreme Court, which summarily denied the petition.  *See* Doc. Nos. 17-14–17-15.

Petitioner then filed a petition for writ of habeas corpus in the San Diego Superior Court.  *See* Doc. No. 17-16.  The state appellate court denied the petition in a written opinion.  *See* Doc. No. 17-18.  Petitioner next filed a petition for writ of habeas corpus in the California Court of Appeal Court, which was denied in a written opinion.  *See* Doc. Nos. 17-19–17-20.  Finally, he filed a petition for writ of habeas corpus in the California Supreme Court, which was summarily denied.  *See* Doc. Nos. 17-21–17-22.

Petitioner filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court on October 20, 2020.  *See* Petition.  On February 10, 2021, the Court granted Petitioner's motion to stay.  *See* Doc. No. 9.  On May 24, 2021, Petitioner filed Supplemental Briefing, and the stay was lifted on May 26, 2021.  *See* Doc. Nos. 11–12.  Respondent filed an Answer and a Memorandum of Points and Authorities in Support of the Answer on August 4, 2021.  *See* Doc. Nos. 16, 16-1.  Petitioner filed a Traverse on

August 24, 2021.  *See* Doc. No. 19.

## III. DISCUSSION

Petitioner raises three grounds in his Petition.  In ground one, he contends that the evidence was insufficient to support his convictions.  *See* Petition at 6.  In ground two, he contends the trial judge erred when he failed to instruct the jury on a lesser included offense.  *See id.* at 7.  In ground three, he claims his trial counsel was ineffective.  *See id.* at 8; *see also* Doc. No. 11.  Respondent argues the state court's denial of Petitioner's claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See* Doc. No. 16-1 at 13–27.

**A.   Standard of Review**

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding.  28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).  In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable.  *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts.  *See Bell v. Cone*, 535 U.S. 685, 694 (2002).  The court may grant relief under the "unreasonable application" clause if the state court correctly identified

the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case.  *Id.*  Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable."  *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).  The Court may also grant relief if the state court's decision was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision and presumes it provides the basis for the higher court's denial of a claim or claims.  *See Ylst*, 501 U.S. 797, 805–06 (1991).  If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000), *overruled on other grounds by Andrade*, 538 U.S. at 75–76; *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003).  Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision."  *Andrade*, 538 U.S. at 72.

**B.   Sufficiency of the Evidence (Ground One)**

In ground one, Petitioner argues there was insufficient evidence to support his conviction for making criminal threats because the prosecution did not prove he had the immediate ability to carry out the threats.  *See* Petition at 6.  Respondent contends the state court denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *See* Doc. No. 16-1 at 15–19.

Petitioner raised this claim in the petition for review he filed in the California Supreme Court on direct review.  *See* Doc. No. 17-14.  The state supreme court summarily denied the petition.  *See* Doc. No. 17-15.  Accordingly, this Court must "look through" to the state appellate court opinion to determine whether the denial of this claim

was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Ylst*, 501 U.S. at 805–06. That court wrote:

> Bathen claims there was insufficient evidence to establish his threats conveyed an "immediate prospect of execution" because there was no evidence he was in Chula Vista when the calls were placed or that he ever appeared at C.J.'s residence or office after he moved to the east coast. He also claims the threats were not immediate because C.J. knew he lived on the east coast and had not been in contact with him since he moved. We are not persuaded.
>
> Bathen essentially argues the geographic distance between him and C.J. prevented him from "immediately" executing his threats. However, the test is not one of geographic distance. The test is whether, in light of the surrounding circumstances, e.g., the prior relationship of the parties and the manner in which the statement was made, the communication was sufficiently unequivocal, unconditional, immediate and specific as to convey to the victim a gravity of purpose and immediate prospect of execution. (*People v. Bolin* (1998) 18 Cal.4th 297, 340.) Although the criminal threat statute requires an immediate prospect of execution, it "does not require an immediate ability to carry out the threat." (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679; *see People v. Melhaldo* (1998) 60 Cal.App.4th 1529, 1538 [the focus is the *future prospect* of the threat being carried out]; see also *In re David L.* (1991) 234 Cal.App.3d 1655, 1658–1660 [parties need not be in physical proximity when the threat is made].)
>
> Courts have routinely upheld criminal threat convictions absent the defendant's immediate ability to act on the threat. (*People v. Smith* (2009) 178 Cal.App.4th 475, 480 [defendant was in Texas when he threatened the victim who was in California]; *People v. Gaut* (2002) 95 Cal.App.4th 1425, 1431 [threats made from jail].) It is of no consequence that Bathen lived on the east coast when he left the threatening messages because he specifically stated he was "planning on coming out" to California to kidnap, torture, rape and murder C.J. and her daughter. Thus Bathen's threats caused C.J. to implement various security precautions at her home and office, even causing her to avoid shopping centers with garages. A specific date or time was not required to establish the immediacy of execution. (*See Wilson*, 186 Cal.App.4th at p. 806.)
>
> Bathen's reliance on C.J.'s testimony she knew he had moved to the east coast and had not been in contact with him since then is also misplaced.

8

1
2
3
4
5
6
7
8
9
10

That testimony in no way suggests that the threat was not immediate.  To the contrary, C.J. testified she *did not* know Bathen's location when he left the threatening messages.  Although she knew Bathen had moved to the east coast, she did not know whether he had returned to Chula Vista when she received the threatening messages nine years later.  In fact, she relied on law enforcement to locate Bathen and serve him with a notice of the civil restraining order hearing.  It was thus reasonable for C.J. to believe Bathen would carry out his threats against her and her daughter given the specific and graphic nature of his messages.

In sum, we conclude there was ample evidence in the record to establish the immediacy of Bathen's criminal threats.

11
Doc. No. 17-13 at 7–9.

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Due Process Clause of the Constitution guarantees defendants the right to be convicted only upon proof of every element of a crime beyond a reasonable doubt.  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005) (citing *In re Winship*, 397 U.S. 358, 364 (1970)).  On federal habeas corpus review of a conviction on sufficiency of evidence grounds, however, a petitioner "faces a heavy burden" to establish a due process violation.  *Id.*  In assessing a sufficiency of the evidence claim, a state court must apply the standard announced by the Supreme Court in *Jackson v. Virginia*, "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Moreover, under AEDPA "the standards of *Jackson* are applied 'with an additional layer of deference,' requiring the federal court to determine 'whether the decision of the [state court] reflected an "unreasonable application of" *Jackson* . . . to the facts of this case.'"  *Maquiz v. Hedgpeth*, 907 F.3d 1212, 1217 (9th Cir. 2018) (internal citations omitted).  A federal habeas court must "mindful of 'the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review.'"  *Juan H.*, 408 F.3d at 1274 (quoting *Wright v. West*, 505 U.S. 277, 296–97 (1992).)  Deference

under AEDPA, however, "does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).  While circumstantial evidence can be sufficient to support a conviction, "[s]peculation and conjecture cannot take the place of reasonable inferences and evidence . . . ."  *Juan H.*, 408 F.3d at 1279; *see also Maquiz*, 907 F.3d 1212, 1217–18 (9th Cir. 2018); *United States v. Lewis*, 787 F.2d 1318, 1323 (9th Cir. 2000) ("mere suspicion or speculation cannot be the basis for logical inferences").

In determining whether sufficient evidence has been presented, the Court refers to the elements of the crime as defined by state law.  *See Jackson*, 443 U.S. at 324, n. 16; *Juan H.*, 408 F.3d at 1276.  A conviction under California Penal Code § 422 requires proof beyond a reasonable doubt of the following elements:

> (1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat – which may be "made verbally, in writing, or by means of an electronic communication device" – was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.

*People v. Roles*, 257 Cal. App. 5th 935, 941–42 (2020) (quoting *People v. Toledo*, 26 Cal. 4th 221, 227–28 (2001) (quotation marks omitted).)

Petitioner only challenges the sufficiency of the evidence to support the third element.  He claims that "[t]he evidence did not support a finding that petitioner had the immediate ability to carry out the threats . . . [because he was] living across the country from the victim."  (Pet., ECF No. 1 at 6.)  As the state appellate court noted, however, California law is clear that the prosecution does not need to prove a defendant had the

immediate ability to carry out the threats. Rather, the requirement that the threat be "unequivocal, unconditional, immediate, and specific" has been described as follows:

> "A threat is sufficiently specific where it threatens death or great bodily injury. A threat is not insufficient simply because it does 'not communicate a time or precise manner of execution, section 422 does not require those details to be expressed.' [Citation.]" (*People v. Butler* (2000) 85 Cal.App.4th 745, 752, 102 Cal.Rptr.2d 269 (*Butler*).)  In addition, section 422 does not require an intent to actually carry out the threatened crime.  (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1220, 62 Cal.Rptr.2d 303.)  Instead, the defendant must intend for the victim to receive and understand the threat, and the threat must be such that it would cause a reasonable person to fear for his or her safety or the safety of his or her immediate family.  (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424, 4 Cal.Rptr.2d 519.)  "While the statute does not require that the violator intend to cause death or serious bodily injury to the victim, not all serious injuries are suffered to the body.  The knowing infliction of mental terror is equally deserving of moral condemnation." (*Ibid*.)

> . . . .

> While the third element of section 422 also requires the threat to convey "'a gravity of purpose and an immediate prospect of execution of the threat,'" it "does not require an immediate ability to carry out the threat.  [Citation.]" (*People v. Lopez* (1999) 74 Cal.App.4th 675, 679, 88 Cal.Rptr.2d 252; *People v. Smith* (2009) 178 Cal.App.4th 475, 480, 100 Cal.Rptr.3d 471.)

*People v. Wilson*, 186 Cal. App. 4th 789, 806–07 (2010).

Further, the threat must be examined "on its face and under the circumstances in which it was made," and "[t]he surrounding circumstances must be examined to determine if the threat is real and genuine, a true threat, and such threats must be judged in their context.  *Id.* (quoting *In re Ricky T.*, 87 Cal. App. 4th 1132, 1137 (2001) (internal quotation marks omitted)).  "[Section 422] . . . require[s] a victim: the listener.  In addition, it requires the listener suffer injury: sustained fear."  *Ayala v. Superior Court of San Mateo County*, 67 Cal. App. 5th 296, __, 282 Cal. Rptr. 3d 108, 113 (2021) (quoting *People v. Solis*, 90 Cal. App. 4th 1002, 1025 (2001) (internal quotation marks omitted)).

Petitioner left three voicemails for C.J., each increasingly violent and specific.  In

the first voicemail he threatened to "bust [C.J.'s] fucking skull open," to "bash [C.J.'s] fucking skull," and to "carve [her] up." Doc. No. 17-1 at 51. In his second voicemail he again threatened to "carve C.J. up" then escalated to threatening to rape and torture her. *Id.* at 53. In the third voicemail, he told C.J. that he still planned on coming to Chula Vista and again threatened to rape and torture her. He escalated his threats further by threatening to "set [her] on fire," and to "find [her] daughter [and] rape and murder that bitch too." *Id.* at 55. He told her twice, "You're fucking dead." *Id.* at 51, 55. Thus, a rational jury could conclude that Petitioner's threats were sufficiently "unequivocal, unconditional, . . . and specific" because they threatened death or great bodily injury. *Jackson*, 443 U.S. at 319; *Wilson*, 186 Cal. App. 4th at 806–07; Cal. Penal Code § 422.

Further, Petitioner's threats were sufficiently "immediate" and conveyed "an immediate prospect of execution of the threat" to satisfy Cal. Penal Code § 422. "'[I]mmediate' . . . mean[s] that degree of seriousness and imminence which is understood by the victim to be attached to the future prospect of the threat being carried out, should the conditions not be met." *Wilson*, 186 Cal. App. 4th at 816 (quoting *People v. Melhaldo*, 60 Cal. App. 4th 1529, 1538 (1998) (internal quotation marks omitted)). In Petitioner's first threat, he stated he was "going to bust your fucking skull open," that he will "bash your fucking skull," and "carve you up." Doc. No. 17-1 at 51. In his second threat, Petitioner stated he was "going to carve you up, I'm going to rape you, I'm going to torture you, I'm going to fuck you up," and that he would "carve your fucking smile off your face." *Id.* at 53. In his third threat, Petitioner said he was "still planning on coming out there, kidnapping you, torturing you, raping the living shit out of you, and set you on fire . . . . You're going to fucking die. Then I'm going to find your daughter [and] rape and murder that bitch too. You're fucking dead." *Id.* at 55.

C.J. testified that when she heard the first voicemail was "terrified" and began "looking around the house to make sure my doors were locked" and that because she "didn't know . . . if somebody was nearby," she had a "terrorized fear response when I heard it." Doc. No. 17-5 at 74. She increased her security at home and work was on

"high alert." *Id.* at 78.  After listening to the second voicemail, she felt "terrified" and "humiliated" and had such a visceral reaction that she threw up. *Id.* at 81.  She also testified she believed her and her daughter's lives were in danger.  See *id.* at 83–84.

In addition, the circumstances surrounding Petitioner's violent threats support the jury's conclusion verdict. *See Wilson*, 186 Cal. App. 4th at 806-07.  The parties' history can . . . be considered as one of the relevant circumstances" used to determine whether the words used by a defendant are sufficiently unequivocal, unconditional, immediate, and specific. *People v. Gaut*, 95 Cal. App. 4th 1425, 1431 (2002) (internal quotation marks and citations omitted).  C.J. testified that when she stopped treating Petitioner in 2008 because he had moved to the east coast, Petitioner became "agitated." Doc. No. 17-5 at 67.  A few months later, C.J. received emails from Petitioner in which he demanded she sit face to face with him and listen without speaking and then apologize. *Id.* at 70.  If she did not do so, he threatened to report her to her professional organization. *See id.* "Bathen's behavior and demands for an apology made her 'uneasy.'" *Id.* at 69. Petitioner's agitation when C.J. terminated their doctor-patient relationship in 2008, his demands for an apology, and his prior threats to report C.J. to her professional organization if she did not comply with his demands was evidence which could lead a jury to rationally conclude that the threats Petitioner made in 2017 were "real and genuine." *See Wilson*, 186 Cal. App. 4th at 806–07.

Petitioner made repeated, specific, and graphic threats to rape, torture, and murder C.J. and her daughter.  He told C.J. he was "planning on coming out there" to execute his threats.  Petitioner had previously exhibited threatening behavior toward C.J. when he became upset and agitated after C.J. ended their professional relationship, demanded she apologize, and threatened to report her if she did not accede to his demands.  A rational jury could conclude from the substance of the voicemails, C.J.'s testimony, and the circumstances of their relationship that Petitioner's threats conveyed to C.J. an immediate prospect of execution of the threat. *Jackson*, 443 U.S. at 319; *Wilson*, 186 Cal. App. 4th at 806–07; Cal. Penal Code § 422.  Given all of these facts, a rational jury could conclude

13

the threats were sufficiently immediate. *Jackson*, 443 U.S. at 319; *Wilson*, 186 Cal. App. 4th at 806–07.

Petitioner contends the evidence was not sufficient to show threats were sufficiently immediate because he made them "while living across the country from the victim." Petition at 6. Although C.J. knew Petitioner had moved to the east coast in 2008, he could have moved back to Chula Vista without her knowledge. Indeed, C.J. testified she did not know where Petitioner was at the time he made the threats. *See* Doc. No. 17-5 at 82. Moreover, in his last threat, he told C.J. he was "still planning on coming out there" to carry out his threats to kidnap, rape, murder, and torture her and her daughter. Finally, as previously noted, California law is clear that the prosecution does not need to prove a defendant had the immediate ability to carry out the threats. *Wilson*, 186 Cal. App. 4th at 807.

For the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. 28 U.S.C. § 2254(d); *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Accordingly, Petitioner is not entitled to relief as to this claim.

## C.  Jury Instructions (Ground Two)

Petitioner argues in ground two that the trial court erred when it failed to instruct the jury on the lesser included offense of attempted criminal threat. *See* Petition at 7. Respondent contends the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See* Doc. No. 16-1 at 19–23.

Petitioner raised the claim in the petition for review he filed in the California Supreme Court on direct review. *See* Doc. No. 17-14. The California Supreme Court summarily denied the petition. *See* Doc. No. 17-15. This Court must therefore "look through" to the state appellate court's denial of the claim to determine whether it was contrary to, or an unreasonable application of, clearly established Supreme Court law.

14

*Ylst*, 501 U.S. at 805–06.  That court wrote:

> Bathen argues the lesser included offense instruction should have been given because the jury might have convicted him of the lesser offense if it had lingering doubts about the immediacy element.  Bathen points to a juror note requesting further clarification of the meaning of "immediate" and "immediate prospect" in support of his argument that at least one juror could have opted for the lesser offense of attempted criminal threat.
>
> An attempted criminal threat is a lesser included offense of a criminal threat.  (*Toledo*, *supra*, 26 Cal.4th at p. 226.)  "'[I]f a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat.'"  (*People v. Chandler* (2014) 60 Cal.4th 508, 515.)
>
> Here, C.J.'s and her husband's testimony provided substantial evidence regarding the immediate prospect of execution of Bathen's threats.  C.J. called her husband after receiving Bathen's first threatening message.  She expressed her fear to her husband and the police when she ascertained the name and telephone number associated with the call.  She also changed her lifestyle and implemented security precautions at her home and workplace, which continued after she received Bathen's second threatening message.  She worried enough about her safety that she locked all the doors and windows at her home, had security doors installed at her office, warned her coworkers about the threats, and required an escort to and from her car in the office parking lot.  After receiving Bathen's third threatening message, she applied for and obtained a civil restraining order against him.  At trial, C.J. testified she thought she and her daughter were in danger and that Bathen was serious about carrying out the threats.  Based on the foregoing, there was substantial evidence that Bathen committed the greater offense.
>
> We thus conclude the court did not err by failing to give a sua sponte instruction on the lesser included offense of attempted criminal threat.

Doc. No. 17-13 at 11–13.

There is no clearly established Supreme Court law which requires a trial court to

1    instruct on a lesser included offense in non-capital cases. *See Solis v. Garcia*, 219 F.3d

2    922, 929 (9th Cir. 2000); *see also Cortez v. Callahan*, No. 18-cv-02969-LHK, 2021 WL

3    3773617, at *19 (N.D. Cal. Aug. 25, 2021) (stating that "[b]ecause there is no clearly

4    established United State Supreme Court authority that requires lesser include offense

5    instructions, the state appellate court's decision was not contrary to or an unreasonable

6    application of clearly established United States Supreme Court law"); *Gagnon v. Fisher*,

7    No. 2:19-cv-0305-CKF-P, 2021 WL 2953157, at *2 (E.D. Cal. June 29, 2021) (stating

8    that "[the] U.S. Supreme Court has never found that a state court's failure to instruct as to

9    a lesser included offense in a non-capital case provides a basis for federal habeas relief,

10   and the court declined to reach the question of whether such a failure can amount to a

11   violation of the Due Process Clause in *Beck v. Alabama*, 447 U.S. 625, 638 n. 14"). The

12   state court's rejection of this claim, therefore, was neither contrary to, nor an

13   unreasonable application of, clearly established Supreme Court law. *Carey v. Musladin*,

14   549 U.S. 70, 77 (2006); 28 U.S.C. § 2254.

15          As a general proposition, however, "[a] criminal defendant is entitled to adequate

16   instructions on his or her theory of defense," *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th

17   Cir. 1984), and a trial court's failure "to correctly instruct the jury on [a] defense may

18   deprive the defendant of his due process right to present a defense." *Bradley v. Duncan*,

19   315 F.3d 1091, 1099 (9th Cir. 2002). In order to warrant an instruction on the defense

20   theory of the case, the theory must be "legally sound" and the evidence presented in the

21   case must "make[] it applicable." *Clark v. Brown*, 450 F.3d 898, 904–05 (9th Cir. 2006)

22   (quoting *Beardslee v. Woodford*, 358 F.3d 560, 577 (9th Cir. 2004)); *see Lopez v.*

23   *McDowell*, No. CV 71-0833-JLS-JPR, 2019 WL 7708876, at *15 (C.D. Cal. Nov. 17,

24   2019).[1]

---

27   [1] California law is consistent with this principal. A trial judge must instruct the jury on a lesser included
     offense if it is supported by substantial evidence, including defenses that are not inconsistent with the

28   defendant's theory of the case. *People v. Breverman*, 19 Cal. 4th 142, 148–49 (1998); *People v.*
     *Montoya*, 7 Cal. 4th 1027, 1047 (1994).

1    An attempt to commit a crime is defined as "a direct but ineffective step" toward

2  committing the crime coupled with an intent to commit that crime.   CALCRIM No. 460.

3  The California Supreme Court has stated the crime of attempted criminal threat

4  "encompasses situations where a defendant intends to commit a criminal threat 'but is

5  thwarted from completing the crime by some fortuity or unanticipated event.'"   *People v.*

6  *Chandler*, 60 Cal. 4th 508, 515 (2014) (quoting *Toledo*, 26 Cal. 4th at 232).   Examples

7  cited by the *Chandler* court include a written threat intercepted before the victim receives

8  it or an oral threat that is not understood as a threat by the victim.   *Id.*   "[W]hen a

9  defendant is charged with attempted criminal threat, the jury must be instructed that the

10  offense requires not only that the defendant have an intent to threaten but also that the

11  intended threat be sufficient under the circumstances to cause a reasonable person to be in

12  sustained fear."   *Id.* at 548–49.

13    The evidence presented at Petitioner's trial did not support a defense theory that

14  Petitioner made a "direct but ineffectual step" toward making criminal threats to C.J.   The

15  defense challenged C.J.'s identification of Petitioner as the individual who left the threats

16  on her voicemail and whether Petitioner's lack of proximity to C.J. failed to establish the

17  necessary immediacy to convict him of the crime of making a criminal threat.   *See* Doc.

18  No. 17-7 at 3–15.   The defense did not argue that Petitioner made a "direct but ineffectual

19  step" towards threatening C.J.

20    Even if error did occur, jury instruction error is subject to harmless error analysis,

21  that is, if error is found, relief can only be granted if it had a substantial and injurious

22  effect on the jury's verdict.   *See California v. Roy*, 519 U.S. 2, 6 (1996); *Brecht v.*

23  *Abrahamson*, 507 U.S. 619, 637 (1993).   When a lesser included offense instruction is

24  given to juries in California, they are instructed that the trial judge "can accept a verdict

25  of guilty of a lesser crime only if you have found the defendant not guilty of the

26  corresponding greater crime."   CALCRIM Nos. 3517–3519.   As discussed above in

27  Section IV(B), there was more than sufficient evidence from which a rational jury could

28  conclude Petitioner was guilty of the greater offense of making a criminal threat.

Accordingly, the state court's denial of this claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Bell*, 535 U.S. at 694. Nor was it based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(2). Therefore, Petitioner is not entitled to relief as to this claim.

**D.   Ineffective Assistance of Counsel (Ground Three)**

Petitioner contends in Ground Three that his trial counsel was ineffective because she did not investigate whether his use of Lexapro caused him to commit the crimes of which he was convicted. *See* Doc. No. 11. He claims trial counsel could have presented two defenses based on his use of Lexapro, namely voluntary intoxication, which he argues could have negated the intent element of his crimes, or unconsciousness based on involuntary intoxication. *Id.* at 11. He contends either defense would have been more successful than those presented by trial counsel. *Id.* at 11–29. Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *See* Doc. No. 16-1 at 23–27.

Petitioner raised this claim in the habeas corpus petition he filed in the California Supreme Court. *See* Doc. No. 17-21. The state supreme court denied the petition on the merits, citing *Harrington v. Richter*, 562 U.S. 86 (2011) and *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). *See* Doc. No. 17-22. Accordingly, this Court must "look through" to the last reasoned state court decision addressing the claim, which is the state appellate court's opinion. *See* Doc. No. 17-20. Concluding Petitioner had failed to state a prima facie case for relief, that court wrote:

> The record Bathen has provided does not show counsel knew or should have known an investigation of a "medication-based defense" was needed. In his declaration, Bathen states he told trial counsel he "was on the medication on the dates of the incidents," but he "had no explanation as to why the incidents occurred." Bathen states counsel asked him if he "had taken any illegal or recreational drugs," and he "responded no." He did not tell counsel about the increasingly severe adverse effects from Lexapro he now say he had been experiencing for six months before he left the threatening message on his former psychotherapist's voicemail. Instead, he repeatedly told counsel "he

18

wished to deny the allegations in their entirety in that he never made the phone calls, and if he did, the issue went to the 'immediacy' aspect, as he was physically located on the other side of the country during the time of the alleged calls." Counsel nevertheless referred Bathen to a psychologist for an evaluation. In his report, the psychologist wrote that Bathen stated, "'I am medicated with Lexapro by my general practitioner for depression. I think it helps.'" Bathen told the psychologist he had no thoughts of suicide or homicide, had never been hospitalized for a psychiatric condition, and had taken antidepressants that were not effective but "Lexapro has been helpful." Bathen also told the psychologist there was "no factual basis" for the criminal charges and "den[ied] that [he] made those voicemail messages." The psychologist diagnosed Bathen with "[m]ild depression related to current legal circumstances," but made no mention of adverse side effects from Lexapro. Based on what little Bathen told trial counsel about his experience with Lexapro, the psychologist's report that Bathen found the drug was "helpful" and had not experienced homicidal thoughts (such as those expressed in the messages left on his former psychotherapist's voicemail) while taking it, and Bathen's repeated denials of having made the threats, counsel's failure to pursue a defense attributing Bathen's criminal conduct to Lexapro was not "inexcusabl[e]" and thus does not constitute ineffective assistance. (*People v. Williams*, *supra*, 44 Cal.3d at p. 936; see *People v. Pinksy* (1079) 95 Cal.App.3d 194, 200 ["Whether the attorney's conduct falls within the range of a reasonably competent attorney is in this case a question of law for this court to decide."].)

The record also does not establish a reasonable probability of a better outcome for Bathen had trial counsel investigated and presented a "medication-based defense." "In a habeas corpus petition alleging incompetent investigation or presentation of evidence by trial counsel, a petitioner . . . must generally produce that evidence . . . [to] show us what the trial would have been like, had he been competently represented, so we can compare that with the trial that actually occurred and determine whether it is reasonably probable that the result would have been different." (*In re Fields* (1990) 51 Cal.3d 1063, 1071; accord, *In re Hardy* (2007) 41 Cal.4th 977, 1025.) The legal defense Bathen faults counsel for failing to investigate and present is involuntary intoxication, a form of unconsciousness that relieves a defendant of liability for criminal conduct. (Pen. Code § 26, subd. Four; *People v. Velez* (1985) 175 Cal.App.3d 785, 793.) "Involuntary intoxication can be caused by the voluntary ingestion of prescription medication *if the person did not know or have reason to anticipate the drug's intoxicating effects*." (*People v. Mathson* (2012) 210 Cal.App.4th 1297, 1313, italics added.) Based on documents Bathen attached to his petition, an involuntary

intoxication defense would not have been available to him.   In his own declaration, Bathen states that in January 2017, he began experiencing adverse effects of Lexapro, including "memory issues," "periods of disorientation," and "mania," which worsened over the next six months.   He also states a "warning stapled to the outside of the bag the medication comes in" advised him to call his healthcare provider if he had symptoms such as "acting aggressive or violent," or "agitation, hallucinations, coma or other changes in mental status."   Bathen admits his supervisors "reprimanded him in January of 2017 for "compulsively pacing back and forth at work,"   Other declarations attached to the petition also undermine an involuntary intoxication defense. The declarants (whom Bathen calls "potential witnesses") state that: (1) Bathen engaged in "strange and sudden aggressive behavior" and had an "abrupt change in mood" when he started taking antidepressants in 2004; (2) he had "uncharacteristic behavioral changes" and was "very agitated and uneasy, at times, and unable to sleep well" when he was taking antidepressants in 2006; (3) his "personality changed" and he engaged in "erratic behavior" in the beginning of 2017, when he started taking "new medication"; and (4) he "g[o]t up from his desk, nearly every five minutes at time" and had abnormal facial movements at work in January and February 2017, and told his supervisor a recent change in medications "may be causing some of the abnormal behavior."   Bathen's evidence thus shows he know or had reason to know of the adverse effects of Lexapro and other antidepressants on his behavior and mental status before he made the criminal threats against his former psychotherapist.    Since the defense of involuntary intoxication therefore was unavailable, (*Mathson*, at p. 1327; *Velez*, at p. 797), Bathen suffered no prejudice from his trial counsel's failure to pursue it (*In re Fields*, *supra*, at p. 1070).

Doc. No. 17-20 at 4–5.

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).   "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.   He must also show he was prejudiced by counsel's errors. *Id*. at 694.   Prejudice can be demonstrated by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*.; *see also Fretwell v. Lockhart*, 506 U.S. 364,

372 (1993).  "The likelihood of a different result must be substantial, not just conceivable."  *Harrington*, 562 U.S. at 112.

Further, *Strickland* requires "[j]udicial scrutiny of counsel's performance . . . be highly deferential."  *Strickland*, 466 U.S. at 689.  There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance."  *Id*. at 686-87.  On federal habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'"  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).  The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one.  *Id*. at 697.

In the declaration he submitted in support of the habeas corpus petition he filed in the California Supreme Court, Petitioner states the general practitioner he was seeing in Virginia, Dr. Barbano, prescribed Lexapro for him in November of 2016, but there is no evidence in either Petitioner's declaration or any of the other documents he has submitted here or in state court about when he actually began taking Lexapro.  *See* Petition; *see also* Doc. Nos. 11, 17-21, 19, 21.  Petitioner also states he began suffering various behavioral changes, including akathisia, which, according to Petitioner, is a "medically induced syndrome that makes it hard for you to stay still," memory issues, disorientation, "facial grimacing," insomnia, mania, and agitation beginning in January of 2017 and lasting until he made the threatening phone calls to C.J.  Doc. No. 17-21 at 43.  In addition, he claims that "[o]n the dates of the incidents . . . [he] further experienced . . . disorientation, profuse sweating, and violent verbal outbursts."  *Id.*  Petitioner refers to several letters from experts in the effects of Lexapro and potential witnesses which he submitted as part of the habeas corpus petition he filed in the California Supreme Court as support for his claims.  *See* Doc. No. 17-21 at 57–72, 112–16, 138–39, 144–45.  Petitioner argues trial counsel should have investigated whether there was a link between the Lexapro he was

21

taking and the side effects he alleges he was suffering from at the time he made the threats. *See* Doc. No. 11 at 10–28. Had she done so, Petitioner contends, she could have presented voluntary or involuntary intoxication defense which would have negated the intent element of the charges. *See id.*

Counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. This duty, however, "'is not limitless,' and . . .'it does not necessarily require that every conceivable witness be interviewed or that counsel must pursue every path until it bears fruit or until all conceivable hope withers.'" *Hamilton v. Ayers*, 583 F.3d 1100, 1129 (9th Cir. 2009) (citation omitted); *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001). "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691.

Here, despite experiencing disturbing symptoms for nearly six months, by his own admission Petitioner never mentioned them to either his attorney or the psychologist who examined him, Dr. Murphy. *See* Doc. No. 21; Doc. No. 17-21 at 41–47. In his declaration, Petitioner states he told his trial attorney it was his voice on the recordings, but did not tell her about the "disorientation, profuse sweating, and violent verbal outbursts" he claims he was experiencing day of the phone calls in June and July. *Id.* at 43. During his psychological evaluation, he told Murphy he was "currently doing quite well" physically but that he had "mild depression." He said he was taking Lexapro for the depression, which he stated was "helpful." *Id.* at 74–82. In the section of Murphy's report entitled "Discussion of Present Circumstances," Petitioner told Murphy he was being charged with making criminal threats against C.J. but did not talk about the symptoms he was having leading up to or while he was making the threats. *See id.* According to Murphy, Petitioner presented in "an engaging, open, and conversational manner," and had no "homicidal ideation." *Id.* Murphy administered three separate assessments and found no indication Petitioner was suffering from feelings of aggression, violence, anger, or psychopathy. *See id.*

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  Moreover, "[e]stablishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult [because while] [t]he standards created by *Strickland* and § 2254(d) are both "highly deferential," . . . when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted).  "When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*  Here, the state appellate court's conclusion that trial counsel's performance was not deficient was a reasonable application of *Strickland*.  Given Petitioner's failure to tell counsel he had been suffering from unusual symptoms of aggression in the six months prior to the threatening voicemails, or that he was suffering from "disorientation, profuse sweating, and violent verbal outbursts" on the dates he made the threats, that Petitioner also did not reveal the symptoms of aggression and anger he now claims he was suffering from to Dr. Murphy, and Murphy's conclusion that there was "no evidence whatsoever of past indicators or current functioning that would suggest he is likely to act out in an aggressive, assaultive fashion," there is a "reasonable argument" that counsel satisfied *Strickland*'s standard despite not exploring an intoxication defense. *Harrington*, 562 U.S. at 105. *See* Doc. No. 21; *see also* Doc. No. 17-21 at 41–47.

Moreover, Petitioner has also failed to satisfy the prejudice prong of *Strickland*. *Strickland*, 466 U.S. at 694; *Harrington*, 562 U.S. at 112.  Petitioner argues counsel could have presented two defenses: voluntary intoxication, which would have negated the required intent, unconsciousness due to involuntary intoxication. *See* Doc. No. 11 at 11. "A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect."  CALCRIM No. 3426. A jury may consider evidence of voluntary intoxication when deciding whether a defendant acted with the requisite intent. *See id*.  The intent required for a conviction of

California Penal Code 422 is "the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out . . . ."  Cal. Penal Code § 422. While Petitioner has provided a copy of the prescription for Lexapro he received from Dr. Barbano, he does not state in his declaration that he actually took the medication, or, if he did, when he began taking it.  He has provided the Court with letters from doctors who explain that Lexapro  can cause side effects such as aggressive or violent behavior, but there is no information in the letters regarding what dosage the side effects are associated with and how that relates to the dosage Petitioner was allegedly taking.  *See* Doc. No. 21; *see also* Doc. No. 17-21 at 57–72, 112–16, 138–39, 144–45.  Petitioner states in his declaration that he called C.J. "because [he] had repeatedly been told to call [his] healthcare practitioner in the event of an emergency."  Doc. No. 21; *see also* Doc. No. 17-21 at 43.  But this claim is difficult to credit as it was Petitioner's Virginia physician, Dr. Barbano, who had prescribed the Lexapro, not C.J., with whom he had not had contact with for almost ten years.  *See id*. at 42, 130.  No evidence has been provided that he had any similar outburst toward anyone but C.J., a person with whom he had a history of conflict and aggressive behavior.  The rational conclusion to be drawn from these facts is that the feelings of agitation, anger, and aggression he claims he was experiencing as a side effect of Lexapro would have helped explain *why* he made the statements captured in the voicemails, but not *whether* he intended them to be taken as a threat.

        In order to establish prejudice, Petitioner must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  "The likelihood of a different result must be substantial, not just conceivable."  *Harrington*, 562 U.S. at 112.  Given this standard, it is difficult to see how a jury would conclude that Petitioner did not intend his statements to be taken as a threat.

        Petitioner also argues counsel should have presented the defense of "unconsciousness based on involuntary intoxication."  Doc. No. 11 at 11.

"Unconsciousness, if not induced by voluntary intoxication, is a complete defense to all charges." *People v. Halvorsen*, 42 Cal. 4th 379, 417 (2007).  In order to warrant a jury instruction on the defense of involuntary intoxication resulting in unconsciousness, however, a defendant must present substantial evidence that while a defendant committed an act "[he was] not, at the time, conscious of acting." *Id.*  Petitioner states in his declaration that he called C.J.  *See* Doc. No. 21; *see also* Doc. No. 17-21 at 43.  The letters from doctors Petitioner has submitted claim that the side effects of Lexapro caused Petitioner to become agitated and aggressive not that they rendered him unconscious.  *See id.* at 57–72, 112–16, 138–39, 144–45.  These feelings of agitation and aggression allegedly caused him to call C.J. and leave the voicemails.  Thus, the evidence before the Court shows Petitioner was "conscious of acting" when he made the calls.  Because it does not appear Petitioner would have been able to present such a defense, he has not established "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

The state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  28 U.S.C. § 2254(d); *Bell*, 535 U.S. at 694.  Nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d)(2).  Accordingly, Petitioner is not entitled to relief as to this claim.

## V. CONCLUSION

For the foregoing reasons, the Court **DENIES** the Petition.  Rule 11 of the Rules Following 28 U.S.C. § 2254 require the District Court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254 (West 2019).  A certificate of appealability will issue when the petitioner makes a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (West 2019); *Pham v. Terhune*, 400 F.3d 740, 742 (9th Cir. 2005).  A "substantial showing" requires a demonstration that "'reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Beaty v. Stewart*, 303 F.3d 975, 984 (9th Cir. 2002) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  Here,

the Court concludes that reasonable jurists could not find the constitutional claims debatable, and therefore **DENIES** a certificate of appealability.  The Court further **DIRECTS** the Clerk of Court to enter judgment accordingly and close this case.

  **IT IS SO ORDERED**.

Dated:  October 5, 2021

HON. MICHAEL M. ANELLO
United States District Judge